GUY GEORGE GABRIELSON ET AL., PROSECUTORS, v. BOR-
OUGH OF GLEN RIDGE ET AL., RESPONDENTS.

Decided February 4, 1935.

Before Justices CASE, BODINE and DONGES.

For the prosecutors, *Merritt Lane.*

For the respondents, *James P. Mylod* and *Walter C. Ellis.*

The opinion of the court was delivered by

DONGES, J. This is a zoning case and is before us on four *certioraris* and six rules to show cause for *mandamus*. The controversy involves a single question, the refusal of the municipal authorities of the borough of Glen Ridge to permit the construction and operation by relators and prosecutors, hereinafter called "the owners," of a gasoline filling station and of a field demonstration garden upon lands owned by them on the southwesterly side of Bloomfield avenue in the borough of Glen Ridge.

The tract of land in question has a frontage on Bloomfield avenue of two hundred and eighty-nine feet, and extends to Anthony's brook, having a depth of approximately one hundred and forty-one feet on the northerly line and two hundred and ninety-seven feet on the southerly line. The northerly portion of the tract, referred to in the exhibits as "A," being one hundred feet in frontage and one hundred feet in depth, is the lot upon which it is sought to erect the gasoline filling station, and the southerly portion, described in the applica-

tion for the field demonstration garden, and referred to in the exhibits as "B," has a frontage of one hundred and seventy-nine feet on Bloomfield avenue and a depth on its deepest line of two hundred and ninety-seven feet. On the lot "A" it is proposed to erect a building eighteen feet six inches by eighteen feet, designated in the application as "service station." On the lot "B" it is proposed to erect a building thirty feet by twelve feet, designated in the application as "office and tool room."

Application was first made for a permit for the service station. Plans were submitted to the building inspector, who denied a permit upon the ground that the proposed use did not conform to the zoning ordinance. Thereupon the owners appealed to the board of adjustment. After notice and public hearing, the board unanimously found that "owing to special conditions a literal enforcement of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done," the permission should be granted to construct the gasoline station, provided the plan, suggested by the owners, for the field demonstration garden be developed in connection therewith, and it adopted a resolution containing the above finding and recommending to the mayor and council the granting of such a permit. Section 9, subsection 4, chapter 274, laws of 1928, page 702. Thereupon, application was made for a permit for the field demonstration garden, which was denied by the building inspector on the ground that the use did not conform to the zoning ordinance.

The board of adjustment held a further meeting and again unanimously adopted a new resolution recommending to the mayor and council that the applications be granted, and thereafter on March 13th, 1933, adopted a third resolution recommending to the mayor and council that the permits be granted for a period of ten years, upon condition: (a) that the gasoline filling station be erected in compliance "with the terms and provisions of the Glen Ridge building code, its supplements and amendments; said filling station to be erected in accordance with the layout and architectural features shown on the plans and photograph submitted to and now on file

with this board;" (b) that the one-story office and equipment building to be erected upon the land to be used for a field demonstration garden should be erected in compliance "with the terms and provisions of the Glen Ridge building code, its supplements and amendments; said building to be erected in accordance with the layout and general architectural features shown on the plans submitted to and now on file with the board and that the owners of said land be permitted to use said buildings as an office and equipment building for a period of ten (10) years from the date on which the permit for the erection of said building is granted;" and (c) that the permit for the filling station shall not become operative unless and until the owners enter into an agreement with the borough to develop and operate the field demonstration garden for a period of at least one year and further agree that no public parking of motor vehicles be permitted within one hundred feet of Bloomfield avenue or within one hundred and fifty feet of the dividing line of the property of the owners and the residential properties fronting on Clark street.

The conditions imposed were agreeable to the owners, if the borough authorities granted the permits, but they insist that, inasmuch as they were obliged to institute legal proceedings, they are unwilling to agree to the conditions unless this court shall conclude that such limitations are reasonable and proper.

The mayor and council met on February 27th, 1933, and a public hearing was held on the first resolution submitted by the board of adjustment, but no action was taken at that meeting. The resolutions of the board of adjustment, dated March 7th, 1933, and March 13th, 1933, came before the mayor and council at a meeting on March 13th, 1933, and a further public hearing was held. A motion was made to approve the recommendation of the board of adjustment as contained in the resolution of March 13th. Three members of the council voted "Yes," three members voted "No," and the mayor cast the deciding vote—voting "No." In casting his vote the mayor announced that he did so in order "that the town of Glen Ridge should keep the traditions of old and be maintained as a residential section."

The owners' land is all within the corporate limits of Glen Ridge but is opposite the town of Bloomfield, the line between the two municipalities at that point being the middle line of Bloomfield avenue. The easterly line of the owners' property is approximately two hundred and forty-four feet from the westerly line of Bloomfield. On the opposite or northerly side of Bloomfield avenue the town of Bloomfield extends for approximately one hundred and fifty feet west of the owners' land. So that, the middle of Bloomfield avenue divides the two municipalities for a distance of approximately five hundred feet. The land on Bloomfield avenue in Bloomfield, opposite the owners' land, is zoned for business, and that business zone extends to the west and to the east of the owners' lands. Bloomfield avenue in Bloomfield, upon the same side of the street as the *locus* and within approximately two hundred and forty-four feet thereof, is zoned for business. Opposite the *locus,* in Bloomfield, is a gasoline station and somewhat to the east thereof are an automobile repair shop and stores. Also opposite the *locus,* in Bloomfield, is a property that has been used for upwards of thirty years for a saloon, which was closed at the time of the hearing because of a violation of the prohibition law, adjoining which is part of an old hotel, now an oyster and steak house, upon which is a large sign "Sea Food Tavern," and at which beer is sold. *Exhibit C-8.* There are also other buildings in Bloomfield, opposite Glen Ridge frontage on Bloomfield avenue, namely, four stores and apartments. Immediately adjoining the *locus* to the west in Glen Ridge is the factory of the Matchless Metal Polish Company, which has been at that location for a number of years. In the same municipality and back of the dwellings on the easterly side of Clark street is another factory. There are several other business places, including another factory to the west of Parkway. About one thousand two hundred feet west of the *locus* are the Glen Ridge municipal buildings, at which location there are stores, garages, filling stations and offices.

There was testimony from a number of persons called by both sides, the general effect of which was that by reason of the adjacent business properties the lands of the owners could

not be advantageously used for high price dwellings such as would be required on land of such value in order to make adequate return on the value thereof. We do not, however, deem this to be a controlling factor in a case of this sort. The question is whether the restriction imposed is arbitrary and unreasonable and without substantial relation to public health, safety, morals or the general welfare of the community.

The statute, adopted in pursuance of the constitutional amendment permitting zoning, is chapter 274 of the laws of 1928. *Cum. Supp. Comp. Stat.* 1925-1930, *p.* 1244. Section 5 provides as follows:

"5. Purposes in View. Such regulations shall be made in accordance with a comprehensive plan and designed for one or more of the following purposes: To lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health, morals or the general welfare; to provide adequate light and air; to prevent the overcrowding of land or buildings; to avoid undue concentration of population. Such regulation shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."

In *Durkin Lumber Co.* v. *Fitzsimmons,* 106 *N. J. L.* 183; 147 *Atl. Rep.* 555, it was said, in discussing *State (Ignaciunas)* v. *Nutley,* 99 *N. J. L.* 389; 125 *Atl. Rep.* 121:

"It was therein held [Chief Justice Gummere] that 'the legislature in its grant of power to the several municipalities of the state to regulate the use to which a property owner may put his property, even to the extent of prohibiting its use for a particular purpose, limited that power by the provision of the statute that such regulation must "be designed to promote the public health, safety and general welfare." If, therefore, the ordinance, in its application to the property of any particular owner, does not come within the limitation of the statute, to that extent it is without legal justification and void.' The reasoning of the case clearly demonstrated and the opinion

concisely held that the ordinary use of property is not authorized by the general welfare clause of the statute to be prohibited because repugnant to the sentiments or desires of a particular class residing in the immediate neighborhood thereof, but only because such use is detrimental to the interests of the public at large; 'that the restriction authorized by this provision of the statute upon the untrammeled use of property for promotion of the general welfare of the community must be such as will tend in some degree to prevent harm to the public generally or to promote the common good of the whole people of such community.' "

In *Neclow* v. *Cambridge*, 277 *U. S.* 183, it was said:

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals or general welfare."

The legislature set forth the purposes to be attained by zoning ordinances. Which of the declared purposes will the contemplated uses violate?

It is not asserted that the owners' proposed uses will unduly increase congestion in the streets. Nor can it be asserted that fire, panic or other danger will be presented. The presence of gasoline and service stations in the heart of the municipality by municipal sanction clearly evidences that such structures are not deemed extra hazardous in the respects mentioned. Nor will there be any tendency to decrease adequate light and air. Nor can it be said that the prohibition of the proposed uses will promote health, morals or the general welfare.

The statute provides that regulation of use of property shall be made with reasonable consideration to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of the land. So viewed, it seems uncontrovertible that the lands herein involved may be most appropriately used for the purposes intended, and

that the limitation upon the use of this property by the ordinance will be a hardship upon its owners.

We conclude, therefore, that there is nothing in the record reasonably tending to show that the proposed uses are liable to work any injury, inconvenience or annoyance to the community or any person. The withholding of permits, under the circumstances, is arbitrary and unjustified.

The action of the mayor and council declining to approve the recommendation of the board of adjustment will be set aside, and *mandamus* will issue requiring the building inspector to issue suitable permits. *Provident Institution for Savings* v. *Castles,* 11 *N. J. Mis. R.* 773; 168 *Atl. Rep.* 169.